IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 15-00194-01/02-CR-W-DW |
| ) | |
| KEVIN RAY WILSON, ) | |
| and ) | |
| KENNETH W. DOWELL ) | |
| ) | |
| Defendants. ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on defendants' motions to suppress evidence. (Docs. ##27 & 28) For the reasons set forth below, it is recommended that the motion be denied.

I. BACKGROUND

On May 20, 2015, a criminal complaint was filed charging defendants Kevin Ray Wilson and Kenneth W. Dowell with a conspiracy to possess with intent to distribute methamphetamine or a substance containing methamphetamine, a Scheduled II controlled substance. (Doc. #1)

On June 10, 2015, the Grand Jury returned a one-count indictment against both defendants. (Doc. #18) The indictment charges that on May 19, 2015, defendants "did knowingly and intentionally combine, conspire, confederate and agree with each other and others, both known and unknown, to knowingly and intentionally distribute and possess with the intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, contrary to the provisions of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A) and 846." (Doc. #18)

On September 1, 2015, both defendants filed separate motions to suppress. (Docs. ##27 & 28) Defendant Wilson argues that: 1) the traffic stop was pretextual and not supported by probable cause, 2) he was unlawfully detained beyond the scope of the traffic stop without reasonable suspicion to prolong the traffic stop, and 3) the canine search did not provide probable cause to search the vehicle. (Doc. #27) Defendant Dowell joined Wilson in his second argument (that the duration of the traffic stop violated their constitutional rights) and additionally argues that police officers did not have reasonable suspicion to search the coat found in the vehicle. (Doc. #28) An evidentiary hearing on the motion to suppress was held on September 29, 2015 and March 25, 2016.[1] Defendant Wilson was represented by Kenton M. Hall during the September hearing and by Patrick Peters at the March hearing[2]. Defendant Dowell was represented by Dione C. Greene. The Government was represented by Assistant United States Attorney Alison D. Dunning. The government called Deputy Kent Shutt, Officer Danny Logan and Deputy Martin Dye to testify at the suppression hearing. Defendant Wilson also testified at the suppression hearing.

## II. FINDINGS OF FACT

On the basis of the evidence presented at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. On May 19, 2015, Kent Shutt, a deputy sheriff with the Lafayette County Sheriff's Department, observed the driver of a 2004 Toyota 4Runner SUV avoid eye movement, move his hands to the ten and two position and sit up in his seat.[3] (Tr. 1 at

---

[1] Transcript 1 ("Tr. 1") is the transcript of the hearing on the motion to suppress held on September 29, 2015. Transcript 2 ("Tr. 2") is the transcript of the hearing held on March 25, 2016.
[2] On December 2, 2015, Mr. Patrick Peters entered his appearance as retained counsel, and Mr. Hall, CJA counsel, filed a motion to withdraw.
[3] Wilson acknowledges that when he saw the patrol car, he sat up in his seat and grabbed the

2

10-11, 87) The SUV, which was headed eastbound on I-70, had both a license plate and what appeared to be a temporary tag. (Tr. 1 at 10-12, 79) At that time, Deputy Sheriff pulled onto the interstate and approached the SUV. (Tr. 1 at 12) Upon approaching the vehicle, Deputy Shutt determined that there was in fact a temporary license plate and a regular license plate on the vehicle. (Tr. 1 at 12, 80) The SUV then changed lanes without using a signal and in front of a semi-truck, causing the semi-truck to brake. (Tr. 1 at 12, 80) Upon seeing the unsafe lane change, and the failure to signal, Deputy Shutt initiated a stop of the SUV. (Tr. 1 at 12-13) The SUV exited the interstate, proceeded up the exit ramp and came to a stop at the top of the exit ramp. (Tr. 1 at 13, 84) The driver of the SUV again failed to use his signal when exiting the interstate and when pulling off onto the shoulder. (Tr. 1 at 13) The stop was initiated at 12:26 p.m. (Tr. 1 at 10-11)

2. As Deputy Shutt approached the passenger side, he could see the passenger, later identified as Kenneth Dowell, bent over in the seat as if he was picking something up or putting something on the floorboard. (Tr. 1 at 14, 15, 86, 110) Deputy Shutt asked the driver of the car, later identified as Kevin Ray Wilson, for his driver's license and proof of insurance. (Tr. 1 at 14) As Deputy Shutt was speaking to Wilson, the passenger (Dowell) pulled out his driver's license to hand to the deputy. (Tr. 1 at 16) Deputy Shutt found the passenger's actions to be abnormal for the situation. (Tr. 1 at 17) Wilson produced a driver's license and a sales slip for the SUV but was unable to show proof of registration. (Tr. 1 at 17-18) The sales slip matched the description of the SUV and indicated that the SUV was purchased by Wilson on May 16, 2015. (Tr. 1 at 23, Tr. 2 at 92) In addition to the sales slip, Wilson produced a Buyer's Guide for the SUV and an odometer disclosure statement for the SUV that were given to him at the time he purchased the vehicle. (Tr. 1 at 24) Wilson informed Deputy Shutt that he had insurance but did not have the insurance card or proof of insurance. (Tr. 1 at 19) As part of a recent training, Deputy Shutt was told that there was a recent trend in the narcotics trade to use recently purchased older used vehicles and rental vehicles in transporting narcotics. (Tr. 1 at 24-25, 105) The reason for the trend was to avoid seizures of personal or family cars. (Tr. 1 at 24-25) Deputy Shutt informed Wilson that he would be issuing a warning for the traffic violations and requested that Wilson accompany him to his squad car in order to perform a driver's license check and determine which plates should be on the SUV.[4] (Tr. 1 at 19, Tr. 2 at 94)

3. Wilson accompanied Deputy Shutt to the patrol car and sat in the front passenger seat. (Tr. 1 at 20) Wilson explained that the license plate was on at the dealership and that he failed to take it off prior to leaving. (Tr. 1 at 21) After running the tags through the computer it appeared that the temporary tag was the appropriate tag for the SUV. (Tr. 1 at 21) The license plate was registered to a female. (Tr. 1 at 25) That

---

steering wheel with both hands. (Tr. 2 at 88)

[4] Mr. Wilson accompanied the police officer to the patrol car, but did not feel that he was free to leave. (Tr. 2 at 95)

female's name also appeared in paperwork in the vehicle and appeared to be the former owner of the SUV. (Tr. 1 at 25-27) Deputy Shutt ran the temporary tags through the computer, but the tags did not come back on file. (Tr. 1 at 27) Deputy Shutt did not find this suspicious as out-of-state temporary tags often do not show up as on file. (Tr. 1 at 27-28) Furthermore, running out-of-state temporary tags takes longer than running an in-state computer inquiry. (Tr. 1 at 28) Wilson told Deputy Shutt that he lives in Waynesburg, Kentucky, but was returning from a short trip to Wichita. (Tr. 1 at 28-29) Wilson stated that he and Dowell were going to Dowell's brother's residence in order to work out some family issues. (Tr. 1 at 28, 96, Tr. 2 at 99) Wilson told the deputy that it was an eleven hour trip one-way. (Tr. 1 at 28) Deputy Shutt found it a little bit strange that the two men were making such a long trip just to visit family for a short amount of time. (Tr. 1 at 29) Upon inquiry, Wilson told Deputy Shutt that he and Dowell had known each other for a while and that he was just along for the trip. (Tr. 1 at 29, 32, Tr. 2 at 99). During Deputy Shutt's inquiries, Wilson seemed very nervous. (Tr. at 29) If Deputy Shutt was asking questions about Wilson's license, Wilson looked at Deputy Shutt; but when questions arose regarding the purpose of the trip, Wilson looked away and out the window. (Tr. 1 at 27) In Deputy Shutt's experience, once individuals learn that they are just going to be issued a warning, any signs of nervousness usually dissipate, but that did not happen with Wilson. (Tr. 1 at 30)

4. During the time that Wilson was in the squad car with Deputy Shutt, Dowell was still seated in the front passenger seat of the SUV. (Tr. 1 at 30) Deputy Shutt left Wilson in the squad car and approached Dowell to inquire more about the trip. (Tr. 1 at 30, Tr. 2 at 100) According to Deputy Shutt, Dowell also appeared nervous. (Tr. 1 at 30) Dowell talked extremely fast and smoked so much that he eventually got to the nub of the cigarette. (Tr. 1 at 30) Dowell informed Deputy Shutt that he was going to Wichita to see his niece who was sick. (Tr. 1 at 30) In response to Deputy Shutt's inquiries, Dowell stated that his niece had appendicitis and was very sick, but the appendix had not ruptured. (Tr. 1 at 31) Based on his experience, Deputy Shutt felt it was odd to make that long of a trip just for appendicitis and therefore pressed Dowell for more information. (Tr. 1 at 31) Dowell indicated that he was close to his niece but that he had not seen her in two to three years. (Tr. 1 at 31) Dowell further explained that he did not have any luggage because it was a short trip. (Tr. 1 at 31-32) Upon obtaining Dowell's driver's license, Deputy Shutt returned to his squad car to check for any warrants or other issues associated with Dowell. (Tr. 1 at 32)

5. As Deputy Shutt was running Dowell's information through the computer he was also completing the paperwork for the warning to Wilson and talking to Wilson about his trip. (Tr. 1 at 32) Deputy Shutt pressed Wilson about his trip because he felt it odd that Dowell's and Wilson's stories were not consistent. (Tr. 1 at 32) Deputy Shutt asked Wilson for the real reason for their trip, to which Wilson stated they were going out to see Dowell's niece and help with some arrangements for her upcoming wedding. (Tr. 1 at 32-33, Tr. 2 at 100) As Deputy Shutt was talking with Wilson for

4

the second time, he noticed that Wilson was attempting to divert Deputy Shutt's attention away from the reason for their trip by asking questions about the license. (Tr. 1 at 34)  Wilson told Deputy Shutt that he was not employed but lived and worked on a farm where he did work around the farm. (Tr. 1 at 35)  Deputy Shutt found it odd that Wilson just bought a brand-new car at a time when he was unemployed. (Tr. 1 at 35-36)

6. Based on the inconsistent stories, the issues with the license plates and change in body language, Deputy Shutt asked Wilson if there was anything illegal in the SUV. (Tr. 1 at 34)  Deputy Shutt explained that he had some suspicion that there was criminal activity going on. (Tr. 1 at 34-35, Tr. 2 at 106)  Deputy Shutt specifically asked whether he had any bombs, knives, or guns and then proceeded to specifically ask about certain narcotics and other drugs. (Tr. 1 at 35)  Wilson replied by simply saying no to each question until Deputy Shutt asked about methamphetamine. (Tr. 1 at 34-35)  Upon being asked about methamphetamine, Wilson turned, chuckled and said something to the effect of "there's no methamphetamine in there" or "no, we don't have any meth." (Tr. 1 at 35, 97)  Wilson stated that he brought some personal hygiene products along but did not have any luggage. (Tr. 1 at 36)  Deputy Shutt asked Wilson what was in the cargo area, to which Wilson replied that there was a spare tire in the cargo area. (Tr. 1 at 36)  Deputy Shutt had noticed that the cargo area contained a tarp that was covering something. (Tr. 1 at 36)  Wilson explained that the tarp was covering the spare tire and some tools but did not elaborate on what kinds of tools were there. (Tr. 1 at 36)  Based on both Wilson and Dowell's inconsistent stories and nervousness, Dowell's actions in bending down in the vehicle as the officer was pulling the SUV over, the newly purchased SUV, Wilson's responses to his inquiries regarding items in the car, and the lack of luggage, Deputy Shutt asked to search the SUV. (Tr. 1 at 37-38, 98)  Wilson told Deputy Shutt that he did not want Deputy Shutt searching the SUV and that he wanted to get back on the road. (Tr. 1 at 38, Tr. 2 at 107)  Deputy Shutt then informed Wilson that he believed he had reasonable suspicion to search the car, listed the reasons why he believed that to be the case and informed Wilson that he was requesting a certified canine drug dog in order to do an exterior sniff of the SUV. (Tr. 1 at 38)

7. At approximately 12:32 p.m., Deputy Shutt requested that Officer Danny Logan from the Higginsville Police Department and his canine respond to the area in order to conduct an exterior sniff of the SUV. (Tr. 1 at 38-39)  At that point only six minutes had elapsed since Deputy Shutt first initiated the vehicle stop. (Tr. 1 at 29)  According to Deputy Shutt a six-minute traffic stop would be a fairly quick stop and that a fifteen to twenty minute vehicle stop would be normal. (Tr. 1 at 40)  Deputy Shutt received word at 12:36 p.m. that Officer Logan was en route. (Tr. 1 at 39)  Deputy Shutt then asked to roll the windows of the SUV up and was granted permission to do so. (Tr. 1 at 40)  Deputy Shutt asked that Dowell step out and stand with Deputy Dye from the Lafayette County Sheriff's Department, who had arrived after the SUV was stopped. (Tr. 1 at 40-41)  According to Deputy Dye, as he and

5

Dowell were standing there, Dowell was breathing heavily, smoking cigarettes and taking antacid tablets, but indicated he was taking the antacids due to eating fast food for lunch. (Tr. 2. At 58) Dowell told Deputy Dye that "he was not a criminal, he was not a drug dealer and he was not a bad person, that he's just a family man." (Tr. 2 at 58) Officer Logan and the K-9 arrived at approximately 12:50 p.m. (Tr. 1 at 39, Tr. 2 at 13) At some point during the stop Trooper Lusk and Trooper DiNovi of the State Highway Patrol also arrived at the scene. (Tr. 1 at 41-42) Deputy Shutt's determination of reasonable suspicion, however, was his own and was not informed by any of the other officers. (Tr. 1 at 42)

8. Upon arriving at the scene, Officer Logan got the canine, Ringo, out of the car and let him walk around in order to acclimate to the area. (Tr. 2 at 14) Deputy Shutt approached Officer Logan and asked whether Officer Logan needed Deputy Shutt to do anything. (Tr. 2 at 15, 16) Officer Logan does not typically ask for the details of the incident so that he may remain unbiased. (Tr. 2 at 15) Officer Logan testified that Ringo is trained to detect marijuana, methamphetamine, cocaine and heroin. (Tr. 2 at 12) In determining whether Ringo has detected an odor, Officer Logan watches to see if Ringo exhibits a change in behavior which indicates that the dog has found the odor and is trying to find the source of the odor. (Tr. 2 at 12, 20) Ringo is trained to then give a passive response at the strongest source of the odor. (Tr. 2 at 12, 20, 22) Ringo's passive response is to sit and stare at the source of the odor. (Tr. 2 at 12)

9. At approximately 12:53 p.m., Officer Logan deployed Ringo around the outside of the vehicle. (Tr. 2 at 14, 18) Ringo first started to exhibit a change in behavior when he was sniffing around the left rear tire area. (Tr. 2 at 18, 10) At that time Ringo was sniffing really hard and tried to get under the SUV. (Tr. 2 at 19) Ringo continued to track the odor at the back side of the car and followed the odor as it drifted in the wind and returned back to the car. (Tr. 2 at 18, 19) Officer Logan took Ringo to the front of the car and reversed directions to give him a different perspective on the odor. (Tr. 2 at 19) When Ringo got to the back of the SUV, he sniffed the seam of the rear hatch real hard and then went into a final response by sitting and staring at the vehicle. (Tr. 2 at 19-20) Ringo gave a final response at approximately 12:55 p.m. Ringo was then placed back in the squad car. (Tr. 2 at 19)

10. Deputy Shutt and Wilson remained in the squad car while Ringo performed an exterior sniff of the SUV. (Tr. 1 at 45-46) As the K-9 approached the back hatch area of the SUV, Wilson started to rub his hands together, took his ball cap off, pushed his hair back, put the ball cap back on, and leaned forward. (Tr. 1 at 46) Deputy Shutt observed Ringo sit at the back tailgate of the SUV. (Tr. 1 at 47) Deputy Shutt commented to Wilson that the dog had indicated that there were narcotics in the SUV, to which Wilson stated that anyone could make a dog sit. (Tr. 1 at 47)

11. Officers then conducted a search of the SUV. (Tr. 2 at 22-23) Deputy Shutt and the other officers began the search of the SUV by opening the hatchback where they

6

discovered a tire and large tire tools under a blanket. (Tr. 1 at 47, 49, Tr. 2 at 59-60) The tools were the type you would normally see in a tire shop and not usually found in vehicles. (Tr. 1 at 47, Tr. 2 at 60) According to Deputy Shutt, narcotics are often transported in spare tires. (Tr. 1 at 47) The tire was deflated, there were rub marks or nicks around the rim, and it looked as if it had been taken off and put back on repeatedly. (Tr. 1 at 50, Tr. 2 at 26, 60) The officers looked at the tire and shook the tire but did not find anything. (Tr. 1 at 47-48, Tr. 2 at 60) Officers then started to search the passenger side and worked their way around the SUV. (Tr. 1 at 48, Tr. 2 at 61) Officer Logan indicated there was something under the front passenger seat and Deputy Shutt pulled out a large wad of money, roughly two to three thousand dollars. (Tr. 1, at 48, Tr. 2 at 27, 61) An additional $1,622.00 was found wadded up together in Wilson's front pocket. (Tr. at 48) Officer Logan could not remember if a small bag of methamphetamine was found during the first search of the SUV, but testified that officers did not find a large amount of methamphetamine at that time. (Tr. 2 at 23)

12. After officers searched the SUV, Ringo was brought back to attempt to pinpoint the source of the odor. (Tr. 2 at 22) At approximately 1:03 p.m., Ringo was allowed to enter the SUV. (Tr. 2 at 23-24) Ringo kept pulling Officer Logan to the spare tire. (Tr. 2 at 24) But because officers had already searched the tire, Officer Logan did not believe the source of the odor was the spare tire and attempted to get Ringo to search the rest of the SUV. (Tr. 2 at 24-25) Ringo did not sit in front of the tire and give a final response. (Tr. 2 at 38) According to Officer Logan, Ringo was overwhelmed by the amount of odor and had never smelled that much methamphetamine before. (Tr. 2 at 37-38) The officers eventually went back to the tire. (Tr. 1 at 51, Tr. 2 at 61) Officer Logan picked up the tire and shook it. (Tr. 2 at 26) As he shook the tire, Officer Logan could feel something moving around in the tire. (Tr. 1 at 51, Tr. 2 at 26) Deputy Shutt used a pocket knife to open the tire and officers then pried the tire away from the rim and found a blue nylon or canvas bag. (Tr. 1 at 51, Tr. 2 at 27, 61) Both Wilson and Dowell were then placed in handcuffs. (Tr. 1 at 51, Tr. 2 at 61) Inside the blue bag were ten individually packaged one-gallon Ziploc bags with a white crystal substance that field tested positive for methamphetamine. (Tr. 1 at 51, Tr. 2 at 27, 61) Each bag weighed approximately one pound. (Tr. 1 at 52, Tr. 2 at 61) Inside the SUV, officers also found a black coat behind the passenger seat. (Tr. 1 at 52, Tr. 2 at 62) Inside the coat was a pack of cigarettes similar to those that Dowell was smoking. (Tr. 1 at 52) The pack of cigarettes also contained a bag of a white crystal substance which field tested positive for methamphetamine. (Tr. 1 at 52, Tr. 2 at 62) There were two or three cell phones in the car and Wilson also had a cellphone. (Tr. 1 at 52) Deputy Shutt testified that it is normal to see multiple cell phones where criminal activity is involved. (Tr. 1 at 53) Deputy Dye recovered a receipt from a McDonald's in Lawrenceburg, Kentucky that was dated on May 18th, the day before the traffic stop, at 7:13p.m. (Tr. 2 at 62) Upon seeing the receipt Deputy Shutt determined that the two were in Wichita for only a short amount of time based on the time that was indicated on the receipt. (Tr. 1 at 57, Tr. 2 at 63)

7

III.  DISCUSSION

Both Wilson and Dowell filed motions to suppress.  In his motion, Wilson argues that the his rights were violated where: 1) the stop was pretextual and not supported by probable cause, 2) he was unlawfully detained beyond the scope of the traffic stop without reasonable suspicion, and 3) the canine search did not provide reasonable suspicion to search the vehicle. (Doc. #27) Dowell similarly argues that the detention lasted longer than permitted under the scope of the traffic stop. (Doc. #28) Furthermore, Dowell briefly argues that the search of the coat was unjustified and illegal. (Doc. #28)

A. The Initial Stop

Wilson argues that the initial stop was not supported by probable cause.  In his motion, Wilson states that he used his turn signal when changing lanes in response to the deputy's activation of his lights. (Doc. #27 at 7)  At the suppression hearing, Wilson testified that he used his signal to merge into the right-hand lane after he passed traffic on the right and before the patrol car was behind him. (Tr. 2 at 88)  Deputy Shutt, however, testified that the SUV made an unsafe lane change without using his signal. (See Fact No. 1, supra)  This Court finds Deputy Shutt's testimony to be credible.  Failing to signal and making an unsafe lane change are violations of Missouri Revised Statutes sections 304.019 and 304.015, respectively.  As the Eighth Circuit Court of Appeals has observed, "a traffic violation--however minor--creates probable cause to stop the driver of the vehicle." United States v. Lyons, 486 F.3d 367, 371 (8th Cir. 2007).  Furthermore, prior to the stop, Deputy Shutt observed what appeared to be a temporary license and a regular license on the SUV. (See Fact No. 1, supra)  In Missouri, license plates are to be removed by the owner at the time the vehicle is sold. 301.140.1 RSMo.  Having a

8

license plate and a temporary tag on a car is problematic because officers do not know which they should rely on in checking the status of the plates. (Tr. 1 at 12) Therefore it was reasonable for the officer to initiate a traffic stop in order to further investigate the plates.

Deputy Shutt's additional motivation in investigating the SUV and the individuals inside is immaterial. The fact that the officers might also have wanted to stop the vehicle for reasons other than the traffic violation does not invalidate the traffic stop. United States v. Sallis, 507 F.3d 646, 649 (8th Cir. 2007), see also Whren v. United States, 517 U.S. 806, 813, 116 S. Ct. 1769, 1774, 135 L. Ed. 2d 89 (1996) (finding that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").

Therefore, this Court finds that the initial stop was a valid stop supported by probable cause.

B. Investigatory Detention

Once an individual has been lawfully stopped, officers are permitted to conduct an investigation "'reasonably related in scope to the circumstances that justified the interference in the first place.'" United States v. Bloomfield, 40 F.3d 910, 915 (8th Cir. 1994) (citing United States v. Cummins, 920 F.2d 498, 502 (8th Cir.1990)). An officer is thus permitted to ask "for the driver's license and registration, request[ ] that the driver sit in the patrol car, and ask[ ] the driver about his destination and purpose." Id. Officers may also conduct computer inquiries to validate a driver's license and registration as well as conduct a computer search to determine whether the driver has any outstanding warrants. United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001). An officer is permitted to verify the information by making inquiries of the passenger. United States v. Barragan, 379 F.3d 524, 529 (8th Cir. 2004). The Eight Circuit has

9

found that "where a seizure of a person is based on probable cause to believe that a traffic violation was committed, an officer does not violate the Fourth Amendment by asking a few questions about matters unrelated to the traffic violation, even if this conversation briefly extends the length of the detention." United States v. Olivera-Mendez, 484 F.3d 505, 510 (8th Cir. 2007). When the officer, in the course of conducting the investigation, develops reasonable suspicion that criminal activity is afoot, he may further the detention in order to investigate his suspicions. United States v. Riley, 684 F.3d 758, 763 (8th Cir. 2012). In determining whether the detention was too long in duration, a court may "examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." United States v. Sharpe, 470 U.S. 675, 686, 105 S. Ct. 1568, 1575, 84 L. Ed. 2d 605 (1985).

An officer's reasonable suspicion that criminal activity is afoot must be based on the totality of the circumstances. United States v. Arvizu, 534 U.S. 266, 273, 122 S. Ct. 744, 750, 151 L. Ed. 2d 740 (2002). The court may take into account the officers training and experience in determining whether or not certain conduct is suggestive of criminal activity. United States v. Beck, 140 F.3d 1129, 1136 (8th Cir. 1998). However, a mere hunch is not sufficient to provide reasonable suspicion. Illinois v. Wardlow, 528 U.S. 119, 124, 120 S. Ct. 673, 676, 145 L. Ed. 2d 570 (2000).

In the instant case, Deputy Shutt believed he had reasonable suspicion that criminal activity was occurring where: 1) Wilson and Dowell gave inconsistent stories regarding the purpose of their trip, 2) Dowell was bent over as if he was reaching under the seat as Deputy Shutt first approached the SUV, 3) both Wilson and Dowell exhibited extreme nervousness, 4)

10

Wilson's responses to inquiries regarding what was in the SUV changed when the officer asked if there was any methamphetamine in the car, and 5) the fact that it was a short trip, the SUV was just purchased and there was a lack of luggage or toiletries in the SUV. (See Fact No. 6, supra)

The stories provided by Wilson and Dowell, especially when coupled with the other factors, provided reasonable suspicion to believe criminal activity was occurring. Wilson first indicated that the reason for the twenty-two hour roundtrip was for Dowell to see his brother to work out some family matters. (See Fact No. 3, supra) Dowell, on the other hand, indicated that the reason for the trip was to visit his sick niece. (See Fact No. 4, supra) Upon hearing Dowell's explanation, Deputy Shutt returned to Wilson and pressed for the real reason for the trip. (See Fact No. 5, supra) At that time, Wilson stated that the two were going to see Dowell's niece to discuss her upcoming wedding. (See Fact No. 5, supra)

In Jones, the officer pointed to the defendant's inconsistent answers to questions regarding his prior arrests and his nervous behavior as the basis for his reasonable suspicions that criminal activity was afoot. Jones, 269 F.3d at 927. The Eighth Circuit found that the defendant's inconsistent answers regarding his prior arrests were "not the sort of inconsistency that warrants" a conclusion that criminal activity was afoot. Id. at 928. However, the court noted that inconsistent answers to questions relating to the destination and purpose of the trip "cast suspicion and doubt on the nature and legitimacy of the activity being investigated." Id. An officer may question a motorist about criminal activity where such inquiry is "fairly prompted" by the officer's observations during a traffic stop which lead to suspicion that criminal activity is occurring. United States v. Bowman, 660 F.3d 338, 343 (8th Cir. 2011). Therefore, the inconsistencies between Wilson and Dowell's answer regarding the purpose of the trip, coupled

11

with their extreme nervousness provided reasonable suspicion that criminal activity was afoot.[5]

Furthermore, there was additional evidence that provided Deputy Shutt with reasonable suspicion. As the SUV was pulling over, Deputy Shutt observed the passenger (Dowell) bent over as if he was reaching under his seat. Defendant Wilson's change in language when asked whether methamphetamine was present also supports the officer's reasonable suspicion. See United States v. Donnelly, 475 F.3d 946, 953 (8th Cir. 2007) (noting that a defendant's "noticeably irregular denials to questions involving methamphetamine . . . strengthened rather than alleviated" the officer's reasonable suspicions.) Finally the fact that the SUV was newly purchased and that the occupants lacked luggage or personal hygiene products supports the officer's belief that criminal activity was afoot.

Deputy Shutt's investigation was conducted diligently and quickly. The stop was initiated at 12:26 p.m. (See Fact No. 1, supra) Deputy Shutt requested a canine at approximately 12:32 pm and the unit arrived at 12:50 p.m. (See Fact No. 8, supra) When Deputy Shutt first pulled the SUV over, he observed the passenger bend over and reach below the seat. (See Fact No. 2, supra) In the course of investigating the discrepancy in the license plates, Deputy Shutt observed extreme nervousness in Wilson. (See Fact No. 3, supra) Deputy Shutt then approached Dowell about the nature and purpose of their travels. Like Wilson, Dowell also appeared nervous. (See Fact No. 4, supra) During questioning, Deputy Shutt's suspicions grew as the defendant's stories became more and more inconsistent. Based on such suspicions, Deputy Shutt began to question Wilson regarding the contents of the SUV. (See Fact No. 6, supra) Wilson's responses to those questions failed to alleviate Deputy Shutt's suspicions. Deputy Shutt

---

[5] The Government's objection to Mr. Dowell's standing to is moot as a result of the holding in this case.

investigation was tailored to the circumstances and properly proceeded as his suspicions grew. Therefore, this Court finds that Deputy Shutt's investigation was appropriate to the situation, was conducted in a diligent manner and was supported by reasonable suspicion of criminal activity.

Last year's Supreme Court holding in Rodriguez v. United States, ___ U.S. ___, 135 S.Ct. 1609, 191 L.Ed.2d 492 (2015), does not change this Court's analysis. In Rodriguez, the Court was concerned with a de minimus extension of a traffic stop where there was no additional reasonable suspicion that criminal activity was afoot. Rodriguez v. United States, ___ U.S. ___, 135 S.Ct. 1609, 1616, 191 L.Ed.2d 492 (2015). The Court found that where no reasonable suspicion exists, police may not extend the duration of a traffic stop in order to conduct a dog sniff. Id. As stated earlier, Deputy Shutt had reasonable suspicion of criminal activity. Therefore Rodriguez does not apply to the instant case.

C. Probable Cause to Search the Car

Wilson next argues that the canine sniff did not provide probable cause to search the vehicle. Wilson's claims are not related to the reliability of the dog. Instead, he argues that the dog did not give an alert or other response to indicate that he smelled a controlled substance. At the hearing on the motion to suppress, Officer Logan fully discussed the training and certification of Ringo as well as himself. Officer Logan explained that a handler looks to a change in behavior of the dog to determine whether the dog has detected the odor of a controlled substance. (See Fact No. 8, supra) Ringo was then trained to sit and stare and the strongest source of the odor. (See Fact No. 8, supra) Officer Logan testified that Ringo did in fact sit and stare at the strongest source of the odor. (See Fact No. 9, supra) Therefore, officers had probable cause to search the vehicle. See United States v. Winters, 600 F.3d 963, 967 (8th Cir. 2010)

13

(noting that "an alert or indication by a properly trained and reliable drug dog provides probable cause for the arrest and search of a person or for the search of a vehicle.")

In a stray remark, Dowell argues that officers were not justified in searching the coat found in the SUV. He provides no relevant case law to justify his claim. Once an officer has probable cause to search a vehicle, the officer is permitted to search "every part of the vehicle and its contents that may conceal the object of the search." United States v. Ross, 456 U.S. 798, 825, 102 S. Ct. 2157, 2173, 72 L. Ed. 2d 572 (1982). Therefore, because officers had probable cause to search the vehicle, they were permitted to search the coat.

### IV. CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendants' Motion to Suppress Evidence and Statements (Docs. ##27 & 28).

Counsel are reminded they have fourteen days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same. A failure to file and serve timely objections shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

*/s/ Sarah W. Hays*
SARAH W. HAYS
UNITED STATES MAGISTRATE JUDGE

14